IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION
_____

BILLY DODSON,                                    Cause No. CV 11-155-M-DWM-JCL

        Petitioner,

    vs.                                              FINDINGS AND RECOMMENDATION
                                                 OF U.S. MAGISTRATE JUDGE
WARDEN MARTIN FRINK;
ATTORNEY GENERAL OF
THE STATE OF MONTANA,

        Respondent.
_____

On November 28, 2011, Petitioner Billy Dodson moved to proceed in forma

pauperis with this action for a writ of habeas corpus under 28 U.S.C. § 2254. Dodson

is a state prisoner proceeding pro se.

On January 30, 2012, Respondent ("the State") was ordered to file certain

documents from the state court record. It complied on February 29, 2012.

## I. Preliminary Screening

Rule 4 of the Rules Governing Section 2254 Cases in the United States District

Courts requires courts to examine the petition before ordering the respondent to file

an answer or any other pleading. The petition must be summarily dismissed "[i]f it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *Id.* If summary dismissal is not warranted, the judge must order the respondent to file an answer, motion, or other response or "to take other action the judge may order." *Id.*

## II. Background

In June 2004, Dodson was released from federal prison and placed on supervised release in the Western District of Washington. By August 2004, he had been arrested for driving a stolen vehicle while using a suspended license and had admitted using cocaine. His probation officer, Michael Larson, obtained a warrant for his arrest. Before the federal warrant was executed, Dodson absconded.

In October 2004, Missoula County deputies began investigating vehicle break-ins at the equestrian trailhead in the Rattlesnake National Recreational Area. Credit cards stolen from the vehicles were used at area stores. Based on various stores' surveillance videos, Missoula County Detective Rick Newlon compiled a description of the culprit and his vehicle and circulated an attempt-to-locate bulletin to local law enforcement. About 45 minutes after the bulletin was issued, the vehicle was pulled over. The driver identified himself as Cody Ford. He consented to a search of his vehicle, and receipts from the illegal purchases were found in it. Ford blamed his

housemate, Mike Arnett.  Eventually, Ford admitted his name was Benjamin Wilton, and he said Arnett's true name was Billy Dodson.  The real Mike Arnett was in federal prison, in a cell he had once shared with Billy Dodson.

Based on additional information obtained from Dodson's girlfriend, authorities located  Dodson in Lynnwood, Washington, and executed the outstanding federal arrest warrant on October 26, 2004.  In Dodson's vehicle and residence, they found identification documents in Arnett's name as well as credit cards and identification documents from the Missoula thefts.

While Dodson was detained in western Washington, a deputy county attorney in Missoula County filed a complaint against him, and the Justice Court issued a warrant for his arrest.  *See* Mont. Code Ann. §§ 3-10-303(1)(e), 46-11-110 (2005);[1] *State v. Benbo*, 570 P.2d 894, 897 (Mont. 1977) (complaint may be filed "not to charge the offense but to establish the basis for an arrest warrant").  Dodson's federal supervised release was soon revoked, and he was sent to USP Beaumont in Texas to serve 24 months in federal prison with no further supervision to follow.  While he was there, Missoula County lodged a detainer against him.  In November 2005, Dodson invoked the Interstate Agreement on Detainers Act ("IAD") by filing a request for disposition with USP Beaumont.

---

[1] Unless otherwise noted, citations to the Montana Code Annotated refer to the 2005 edition.

After about 180 days of not hearing anything on the detainer, *see* Mont. Code Ann. § 46-31-101 Art. III(1), in May 2006, Dodson filed a pro se motion in the Missoula County Justice Court – the court that received the complaint and issued the arrest warrant – to dismiss the charges for violation of the IAD. On August 17, 2006, the State responded to Dodson's motion to dismiss on the grounds that Dodson adduced no evidence that USP Beaumont forwarded his request for disposition and that its own search of its records uncovered no such request. The Justice Court denied Dodson's motion.

On October 26, 2006, an Information was filed in the state district court ("the trial court"). *See* Mont. Code Ann. §§ 3-5-302(1)(a), 46-11-102(1). Dodson was charged with four felonies: theft, deceptive practices /common scheme, issuing a bad check, and identity theft. He was arraigned on November 14, 2006. Public Defender Chris Daly was appointed to represent him.

Ultimately, Dodson faced trial on the following charges:

| Count 1 | theft | Mont. Code Ann. § 45-6-301 (2003) |
| Count 2 | deceptive practices | Mont. Code Ann. § 45-6-317 |
| Count 3 | issuing a bad check | Mont. Code Ann. § 45-6-316 |
| Count 4 | theft by deception | Mont. Code Ann. § 45-6-301(2)(a) |
| Count 5 | identity theft | Mont. Code Ann. § 45-6-332 |

*See* Second Am. Information at 1-2 (doc. 8-11).

Two days before trial, Dodson renewed his motion to dismiss for violation of the IAD. The motion was again denied, this time by the trial court. Trial commenced on April 25, 2007. The trial court dismissed Count 5 at the close of the State's case. On April 27, 2007, the jury returned a guilty verdict on each of Counts 1, 2, 3, and 4.

A sentencing hearing was held on July 3, 2007. Dodson was designated a persistent felony offender and sentenced to serve 80 years on Counts 2, 3, and 4, with 25 years suspended, all terms to run concurrently, and six months on Count 1, also concurrent.

Dodson appealed, represented by the Appellate Defender's Office. On December 8, 2009, the Montana Supreme Court rejected his claims and affirmed his conviction and sentence. *See State v. Dodson*, 221 P.3d 687, 698 ¶ 55 (Mont. 2009). Under *Clay v. United States*, 537 U.S. 522, 532 (2003), his conviction became final on March 8, 2010.

On December 21, 2010, Dodson, proceeding pro se, filed a petition for postconviction relief in the trial court. On February 22, 2011, the trial court dismissed the petition before the State was required to respond.

Dodson again appealed. On November 8, 2011, the Montana Supreme Court affirmed the trial court's denial of postconviction relief. *See* Order at 3, ¶¶ 7-8,

*Dodson v. State*, No. DA 11-0128 (Mont. Nov. 8, 2011) (unpublished disp.).

Pursuant to 28 U.S.C. § 2244(d)(1)(A), Dodson timely filed his federal habeas petition on November 28, 2011.

### III. Dodson's Claims

Dodson contends, first, that the State violated the Interstate Agreement on Detainers Act. Pet. (doc. 1) at 4 ¶ 15A.

Second, Dodson asserts that he was subjected to double jeopardy because Granite County dismissed its charges against him "with prejudice" and those charges were related to the Missoula County charges. *Id.* ¶ 15B.

Third, Dodson alleges that the evidence from the Washington probation search should have been suppressed. *Id.* at 7 ¶ 15C.

Fourth, Dodson claims that the trial court should not have permitted testimony by video teleconferencing at the suppression hearing. *Id.* ¶ 15D.

Fifth, Dodson contends that his motion for mistrial should have been granted because the State breached the trial court's order in limine. *Id.* at 8 ¶ 15F.[2]

Sixth, Dodson asserts that the trial court should have considered his evidentiary objection to admission of two items of mail that his landlord gave to police. *Id.* ¶ 15G.

---

[2] The petition omits the letter E.

Finally, Dodson claims that prejudice accumulated from multiple errors, warranting a new trial. *Id.* ¶ 15H.

## IV. Analysis

Although some or all of Dodson's claims may be barred on procedural grounds, such as procedural default, it is clear that he is not entitled to relief on the merits of his claims. Accordingly, it is more efficient to proceed to the merits. *See, e.g.*, 28 U.S.C. § 2254(b)(2); *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (making detailed analysis of constitutional issue despite outstanding question as to procedural bar); *Gutierrez v. Griggs*, 695 F.2d 1195, 1198 (9th Cir. 1983).

### A. Interstate Agreement on Detainers Act

Dodson claims the trial court erred in denying his motion to dismiss under the IAD. Pet. (doc. 1) at 4 ¶ 15A. It did not. The Interstate Agreement on Detainers required Dodson to notify "the prosecuting officer and the appropriate court" of his request for disposition. Mont. Code Ann. § 46-31-101 Art. III(1) (2005). Montana law provides that the "appropriate court" is the state district court, that is, the trial court. *Id.* § -102. It also provides that only district courts have jurisdiction to try felonies, *id.* § 3-5-302(1)(a), and Dodson was charged with felony offenses, Arrest Warrant (doc. 8-19 at 11). Regardless of USP Beaumont's shortcomings, and despite the prosecutor's actual notice of his request for disposition, it is clear that Dodson did

not notify the trial court of his request until two days before trial.  Trial Court Docket at 4 Entry 56.2 (doc. 8-1); *Fex v. Michigan*, 507 U.S. 43, 52 (1993) ("We hold that the 180-day time period in Article III(a) of the IAD does not commence until the prisoner's request for final disposition . . . has actually been delivered to the court *and* prosecuting officer of the jurisdiction that lodged the detainer against him.") (emphasis added).  Because Dodson's trial commenced well within 180 days of his substantial compliance with the IAD, this claim should be denied.

### B. Double Jeopardy

Jeopardy does not attach until a jury is sworn, or, if there is a bench trial, until the first witness is sworn.  *Serfass v. United States*, 420 U.S. 377, 388 (1975). "[O]nly if that point has once been reached does any subsequent prosecution of the defendant bring the guarantee against double jeopardy even potentially into play." *Crist v. Bretz*, 437 U.S. 28, 32 (1978).  Pretrial dismissal of charges in Granite County, with or without prejudice, had no bearing on double jeopardy under the United States Constitution.  This claim should be denied.

### C. Motion to Suppress

Additional Condition No. 4 of Dodson's federal supervised release provided that "[t]he defendant shall submit to a search of his person, residence, office, property, storage unit or vehicle conducted in a reasonable manner and at a

reasonable time by a[3] probation officer." Appellant Br. App. 2 at 5 (doc. 8-18).

Dodson moved to suppress, among other things, evidence obtained from a warrantless search of a residence in Lynnwood, Washington, arguing that it was not his residence.

First, it is unrealistic to suggest that a probation officer who has reason to believe a person on supervised release is staying at a particular address has no authority to search a private dwelling at that address merely because the releasee identified a different "residence" address on a form. Such a rule would put the releasee in charge of deciding whether, when, and where the condition applies. Instead, the meaning of the term "residence" is amply elaborated in Fourth Amendment law. *See, e.g.*, *Minnesota v. Carter*, 525 U.S. 83, 89-90 (1998). If Dodson resided, in any sense, at the residence searched, then the residence was subject to search pursuant to the terms of his supervised release. If Dodson was not, in any sense, residing there but had property there, then he lacked standing to object to warrantless entry into the residence, and any of his property contained therein was subject to search pursuant to the terms of his release. No Fourth Amendment issue

---

[3] Not "the" probation officer. *Compare* 1 Trial Tr. at 41:5-10 (doc. 8-13) *with* Appellant Br. App. 2 at 5 (doc. 8-18); Judgment (doc. 30) at 4, *United States v. Dodson*, No. 2:00-CR-362-TSZ (W.D. Wash. Dec. 18, 2000), *available at* www.wawd.uscourts.gov (accessed June 15, 2012); Fed. R. Evid. 1001(d), 1002.

arises under these circumstances.[4]

Second, the trial court found, and evidence introduced at the hearing supported its finding, that Dodson himself named the Lynnwood residence as at least one of his residences. 1 Trial Tr. at 41:11-48:3.

Finally, in addition to the lack of merit in the claim, *see Villafuerte v. Lewis*, 75 F.3d 1330, 1342 n.7 (9th Cir. 1996) (per curiam), Dodson had a full and fair opportunity to litigate the legality of the search in state court. There was full briefing and a pretrial hearing. The issue was raised and decided on direct appeal. Dodson did not assert ineffective assistance of trial or appellate counsel in connection with the motion to suppress in his petition for postconviction relief, Pet. for Postconviction Relief at 3-10 (doc. 8-26), nor does he do so now. The claim is barred by *Stone v. Powell*, 428 U.S. 465, 494 (1976).

### D. Remote Testimony

Assuming, for the sake of argument, that a federal constitutional right is

---

[4] The Montana Constitution, of course, explicitly recognizes a right to privacy and provides significantly greater protections against search and seizure than the United States Constitution. *See, e.g.*, *State v. Goetz*, 191 P.3d 489, 504 ¶ 54 (Mont. 2008) (holding that Montana Constitution requires that police obtain warrant to conduct electronic monitoring of conversations between consenting informant and suspect). Dodson's appellate counsel relied on both the federal and the Montana Constitutions in his brief, Appellant Br. at 35-37 (doc. 8-17), but the Montana Supreme Court found no error. *Dodson*, 221 P.3d at 697-98 ¶ 49. And, even if the search violated the Montana Constitution, "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

implicated by a witness's testifying at a pretrial suppression hearing by videoconference, Dodson was not prejudiced. As set forth above, there was no viable Fourth Amendment issue. In addition, the only two witnesses who testified – Dodson's federal probation officer and Detective Rick Newlon – were cross-examined by Dodson's counsel. There was no conflict in the evidence to be resolved by credibility determinations. 1 Trial Tr. at 101:1-103:1. This claim should be denied.

### E. Mistrial

Dodson asserts that "[t]he District Court erred when it denied appellant's motion for mistrial because the State breached the Order *in Limine*." Pet. at 8 ¶ 15F.[5] His state postconviction petition asserted that appellate counsel was ineffective because he did not adequately brief the trial court's denial of his motion for mistrial, which was based on the State's breach of an order *in limine*. Pet. at 8 ¶ 15F. Appellate counsel raised the issue but cited no authority, *see* Appellant Br. at 38 (doc. 8-18), and the Montana Supreme Court declined to consider the claim, *Dodson*, 221 P.3d at 694 ¶ 26 (citing Mont. R. App. P. 12(1)(f)).

Appellate counsel's failure to comply with Mont. R. App. P. 12(1)(f) was

---

[5] Dodson adds "See Brief enclosed herein." He included four briefs with his petition: his opening and reply briefs on direct appeal and his opening brief and reply briefs in the postconviction appeal. The postconviction briefs, however, addressed only the double jeopardy issue.

deficient performance. But the question is whether Dodson was prejudiced; in other words, is there a reasonable probability that the Montana Supreme Court would have remanded Dodson's case for a new trial if appellate counsel had adequately briefed the issue? Or is there a reasonable probability that the State's breach of the order *in limine* deprived Dodson of a fair and impartial trial? *See State v. Scarborough*, 14 P.3d 1202, 1220 ¶¶ 81-85 (Mont. 2000).

Broadly described, the order *in limine* held "that nothing pertaining to Mr. Dodson's criminal record is applicable in this case." 1 Trial Tr. at 315:20-22. Witness Tuttle, one victim of the thefts, referred to a parole officer in her testimony:

Q.   . . . I'll hand you State's Exhibit No. 17. Do you recognize that?

A.   My credit card with horses on it. Of course I do.

Q.   And how long has it been since you've seen that?

A.   Um, I have not seen that since the day my purse was stolen.

Q.   Okay. When did you see all of those items again?

A.   Can I look at my notes now, because I –

Q.   Okay, I'm not really asking for a date. Who did you get them from?

A.   From Mike Larson out of Seattle, the parole officer.

Mr. Daly:   Objection, Your Honor. Sidebar.

The Court:   Yes.  Counsel approach.

(Discussion held off the record.)

Q.      (By Ms. Wing)  Did you actually –

The Court:   Let me say something.  I'd like the jury to disregard the
              witness's last statement.  I'll let you reask it.  You can – the
              jury can accept that she received it from somebody named
              Mike Larson out of Seattle.  But that's all you can take
              from that.  And any other language you might have heard
              in that answer is to be stricken, and you're not to – pretend
              like it wasn't said.

1 Trial Tr. at 291:19-292:20.

A short while later, a reference to other legal proceedings was made:

Q.      Did you work with Michael Larson to return your property?

A.      Yes.

Q.      And how did you do that?

A.      That was almost a year later from when they found my property.
        . . .

. . .

Q.      You think that was a year later?

A.      No, it wasn't a year later when he initially called me.  When I
        started to pursue getting my purse back, it was almost a year later.

Q.      Okay.

A.      It had been quite a while.  And it – I know that any of the legal

13

stuff that had taken place in Seattle, was all –

Mr. Daly:     Objection. Your Honor, may I approach?

The Court:    Sure.

(Discussion held off the record.)

The Court:    Let's move onto some new subject area.

*Id.* at 300:16-301:22.

At the next break, Daly moved for mistrial. The prosecutor responded that when Tuttle referred to Larson, she "just said a parole officer. She didn't say his parole officer." The prosecutor pointed out that the jurors had heard there was a federal warrant out for Wilton's arrest and he went back to prison. She suggested the jurors "may think [Larson is] his parole officer." *Id.* at 317:20-23 (referring to her opening statement, *id.* at 267:20-268:5, 269:2-4; *see also* 2 Trial Tr. at 405:8-406:25, 409:20-410:4 (doc. 8-14) (subsequent testimony about Wilton)). The trial court denied the motion for mistrial, reasoning that the curative instruction given after the reference to Larson as a parole officer adequately dealt with the problem. 1 Trial Tr. at 318:6-10.[6]

---

[6] There was a second motion for mistrial, also based on the order *in limine*, but it is not relevant here for the following reasons. Larson was called to testify on the second day of trial. He brought into the courtroom a black bag bearing an eagle seal and the words "United States Probation and Pretrial Services" in yellow on a black background. The seal and legend faced the jury for part of the officer's testimony. The alternate juror, who was later seated on the jury, was also in a position to see it. At the conclusion of the trial, after the jury announced its verdict, the trial court

14

Dodson argued that the evidence was not sufficient to show his intent to deceive, deprive, or cheat anyone, and to some extent, he pointed to Wilton as the culprit. 2 Trial Tr. at 604:23-611:4. But the State presented overwhelming evidence of Dodson's guilt. For example, when Dodson's personal property in Washington was searched, officers found items stolen in Missoula, including credit cards and identification in other persons' names. Wilton had been arrested and was no longer with Dodson, yet Dodson kept these items. *Id.* at 496:4-501:13; *see also id.* at 586:25-587:24 (jury instruction on Count 1). Surveillance videos showed a person in two stores, Sportsman's Warehouse and Lowe's, purchasing items that appeared to be those listed on the receipts corresponding to the stolen credit cards. 1 Trial Tr. at 337:10-11, 343:21-346:4; 2 Trial Tr. at 526:25-526:1, 537:11-538:2; *see also id.* at 587:25-588:22 (jury instruction on Count 2). At least one of the videos was blurry, but the person shown matched Dodson's general description, and the person certainly was not Wilton, who was much bigger than Dodson. 2 Trial Tr. at 594:9-22. Other videos were clear. *Id.* at 595:24-596:9.[7] At Lowe's, the person purchased a complete

_____

asked the jurors, on the record, whether any of them saw the bag. Two jurors, including the erstwhile alternate, responded that they saw the black and yellow bag but could not see the printing or seal. 2 Trial Tr. at 617:6-618:10. No credible argument could be made, therefore, that Dodson was prejudiced by the appearance of the bag.

[7] The quality of the videos is given as described by the prosecutor in closing argument. Her description was not corrected by the defense.

set of tools, and Dodson's boss testified that he gave Dodson a job when Dodson appeared at a work site with a new and complete set of tools and a sad story to top it off. *Id.* at 376:19-378:24. Dodson told everyone, even his girlfriend, that his name was Mike Arnett. *Id.* at 393:13-394:11, 398:13-399:15. When officers contacted his girlfriend, she told them Dodson had recently purchased a GMC truck from DeMarois Motors. *Id.* at 397:14-23. The truck was purchased on October 22, 2004, with 35 traveler's checks that had been purchased by a Michael D. Bear in Aliso Viejo, California, and were reported stolen on May 12, 1993 [sic]. The checks were signed and countersigned by a person purporting to be Mike Arnett, but the person at the dealership who took them identified Dodson as the person who purchased the vehicle and countersigned the checks. *Id.* at 474:18-25, 476:7-479:2, 481:2-23, 484:12-486:2, 488:9-490:15; *see also id.* at 588:23-590:12 (jury instructions on Counts 3 and 4). There was also evidence of flight; Dodson departed abruptly from the Missoula area shortly after Wilton's arrest and after telling two markedly different stories to his boss and his girlfriend. *Id.* at 382:9-18, 397:17-18.

Each discrete act by Dodson, standing alone, might not necessarily dictate his guilt on a particular charge. Taking all his acts together, they point irresistibly to his guilt. Tuttle's brief, offhand reference to a parole officer and to legal proceedings in Seattle was so pale as to be virtually transparent in comparison.

There is no reasonable probability that the Montana Supreme Court would have remanded Dodson's case for a new trial if appellate counsel had adequately briefed the issue. Breach of the order *in limine* by a State's witness did not deprive Dodson of a fair and impartial trial. This claim should be denied.

### F. Evidentiary Objection

Dodson also asserts that the trial court "erred when it declined to consider an evidentiary objection," again citing "brief of Appellant herein." The only "evidentiary objection" mentioned in the brief involved two items of mail addressed to Mike Arnett and given to Detective Newlon by Dodson's landlady at the cabin he and Wilton shared at Rock Creek. Appellant Br. at 38 (doc. 8-18). The cursory argument in Dodson's appellate brief objected to the fact that the search warrant Newlon was executing at the Rock Creek cabins did not list these items of mail as things to be seized, and Dodson should not have had to file a formal motion to suppress to obtain the trial court's ruling on the issue. *Id.*; *see also* 2 Trial Tr. at 443:10-23. In fact, there was no warrant. *Id.* at 444:4-8. Wilton, who told Newlon that Dodson was using "Mike Arnett" as an alias, consented to allow Newlon to search their cabin for the stolen items and merchandise. *Id.* at 434:4-9. After he completed the consent search, Newlon asked the landlady at Rock Creek to notify him of any mail Mike Arnett received at that address. He went back to the Elk Horn

Ranch in Rock Creek a second time, *id.* at 14-22, and that is when the landlady gave him the mail.

Again, I agree that appellate counsel's failure to comply with Mont. R. App. P. 12(1)(f) was deficient performance. The facts of the claim were wrong as well – including the crucial but unstated fact that Newlon asked the landlady to notify him of any mail.[8] But, again, the question is prejudice: is there a reasonable probability that appellate counsel would have obtained a new trial had the issue been properly briefed? Or, to say the same thing, is there a reasonable probability that the trial court would have granted the motion and suppressed the evidence, and the jury would have reached a different verdict, had Dodson's argument been considered?

Newlon was interested in the envelopes because, at that time, he did not know

---

[8] There is no constitutional violation, state or federal, when a private party hands evidence to an officer. *E.g.*, *State v. Long*, 700 P.3d 153, 71 (Mont. 1985) ("the privacy section of the Montana Constitution contemplates privacy invasion by state action only"). But here, the landlady was acting under the direction of the police, not as a private party. In addition, while Newlon testified the mailbox for packages was a communal one, he described these two items of mail as envelopes, which presumably would go into "a pigeonhole," not the "communal thing." 2 Trial Tr. at 441:20-25. While name and address appear on the outside of an envelope, it is reasonable to question whether the landlady or Newlon could lawfully put themselves in a position from where they could observe the writing on the envelopes in "plain view." *See, e.g.*, *United States v. Choate*, 576 F.2d 165, 204 (9th Cir. 1978) (Hufstedtler, J., concurring and dissenting) ("any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem . . . has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal."); *see also Ex parte Jackson*, 96 U.S. 727, 733 (1877) ("Letters . . . in the mail are as fully guarded . . . as if they were retained by the parties forwarding them in their own domiciles."). The fact that postal workers could readily observe the exterior of the envelopes does not necessarily mean that the landlady and Newlon could.

where Dodson was.  Both envelopes were addressed to Mike Arnett, a known alias of Dodson, and one of them showed a return address, without a name, in Lynnwood, Washington.  Inside the Lynnwood envelope "was a blank piece of paper.  And inside that was an unsealed laminating pouch with a blank international driver's license, supposedly issued by the United Nations Operations of Licensing, permitting driving anywhere in the world."  2 Trial Tr. at 442:20-24.  The other was some sort of document from the Missoula Federal Credit Union.  *Id.* at 443:1-3.  The contents of the envelopes were innocuous and insignificant in light of all the other evidence of Dodson's own actions.  *See supra* at 14-16.  And Newlon testified that the officers in Washington already had Dodson's Lynnwood address – in fact, had already arrested Dodson and were starting their search of the residence at that address – when Newlon contacted them to tell them what the address was.  2 Trial Tr. at 444:24-445:18; *see also* 1 Trial Tr. at 49:24-50:17 (explaining that federal marshals were conducting surveillance at Lynnwood address because Dodson's stolen GMC truck had been spotted there).

Because the evidence against Dodson was overwhelming, and because Newlon's discovery of the Lynnwood address actually played no role in leading law enforcement to Dodson, there is no reasonable probability that the outcome of any proceeding would have been different if only trial or appellate counsel had handled

this claim differently.  It should be denied.

### G. Cumulative Prejudice

In light of all the evidence in the case, there is no merit to a claim of cumulative prejudice.  Dodson correctly identifies some errors.  But a trial is seldom, if ever, perfect.  All that is required is a fair one, and Dodson undoubtedly received that.  This claim should be denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Dodson's claim that the State violated the IAD may be his most compelling. There is no doubt the State had actual notice that he requested a disposition under the IAD, despite the failure of prison officials at USP Beaumont to forward his request

as they were required to do. But the Act plainly required Dodson's request to be directed to the prosecutor and the "appropriate court," and Montana law defines the "appropriate court" as the state district court, that is, the trial court. Dodson filed his motion to dismiss and his request for disposition in the Justice Court. Although it issued the warrant, it is not a state district court. And, at any rate, Dodson's claim under the IAD does not make a substantial showing that he was deprived of a *constitutional* right, only, at most, a *federal* right.

Dodson's other claims border on the frivolous. The evidence presented at trial was overwhelming. Even if a State's witness breached the trial court's order *in limine* by referring to a parole officer and "legal stuff in Seattle," and even if two items of mail should have been excluded from evidence, there is no reasonable probability, or even possibility, that any of these things, or all of them taken together, were sufficiently prejudicial to sway an otherwise-unpersuaded juror. Dodson's claims of cumulative prejudice, prejudice from the trial court's failure to consider a mid-trial motion to suppress, and prejudice from the State's breach of the order *in limine* therefore do not warrant a COA.

Dodson's claim regarding the denial of his motion to suppress lacks merit and is also *Stone*-barred. Jeopardy does not attach until a juror is sworn, so the dismissal of charges in Granite County had no bearing on Dodson's conviction in Missoula

County. Dodson's claim that a federal probation officer should not have been allowed to testify by videoconferencing at a pretrial suppression hearing also lacks merit because the motion to suppress was groundless.

Dodson's trial was not perfect, but it was fair. There is no reason to encourage further proceedings. A COA is not warranted on any issue.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. The Petition (doc. 1) should be DENIED on the merits.

2. The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), Dodson may serve and file written objections to this Findings and Recommendation within fourteen (14) days of the date entered as indicated on the Notice of Electronic Filing. If Dodson files objections, he must itemize each factual finding to which objection is made and must identify the evidence in the record he relies on to contradict that finding; and he must itemize

each recommendation to which objection is made and must set forth the authority he relies on to contradict that recommendation. Failure to assert a relevant fact or argument in objection to this Findings and Recommendation may preclude Dodson from relying on that fact or argument at a later stage of the proceeding. A district judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made. The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendation. Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Dodson must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address." Failure to do so may result in dismissal of his case without notice to him.

DATED this 11th day of July, 2012.


 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge